# FILED

NF

JUL 11 2012

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

NF

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUDGE DOW

| UNITED STATES OF AMERICA | ) | **12 CR 510** |
| | ) | |
| vs. | ) | |
| | ) | Violations: Title 15, United States Code, |
| THOMAS P. FLANAGAN | ) | Sections 78j(b) and 78ff; Title 17, Code of |
| | ) | Federal Regulations, Section 240.10b-5 |
| | ) | |

The UNITED STATES ATTORNEY charges:        **MAGISTRATE JUDGE VALDEZ**

1.     At times material to this information:

       a.     Defendant THOMAS P. FLANAGAN was employed as a partner at
Deloitte & Touche, LLP ("Deloitte"), a Certified Public Accounting firm that provided
auditing and consulting services to a variety of companies, including Best Buy Co., Inc.
("Best Buy"), Walgreen Company ("Walgreens"), Motorola, Inc. ("Motorola"), and Sears
Holding Corporation ("Sears").  Defendant FLANAGAN was an Advisory Partner on
Deloitte's engagements with Best Buy, Walgreens, and Sears, and in that capacity, among
other things, served as a liaison between the client's audit management team and Deloitte's
audit engagement team.  Defendant FLANAGAN also served as a Deloitte partner on
Deloitte's non-audit engagement with Motorola.  Defendant FLANAGAN was a Certified
Public Accountant.

       b.     During the course of his employment as a partner at Deloitte, defendant
THOMAS P. FLANAGAN learned material, nonpublic information about Deloitte audit and
consulting clients, including Best Buy, Walgreens, Motorola, and Sears.  This material,

nonpublic information concerned, among other things, quarterly earnings results and possible acquisition targets.

c.    As a Deloitte partner, defendant THOMAS P. FLANAGAN owed fiduciary and other duties of trust and confidence to Deloitte and to its clients to maintain the confidentiality of the material, nonpublic information he obtained during the course of his employment at Deloitte.    Among other things, these duties required that defendant FLANAGAN obtain no financial interest in any Deloitte audit client and prohibited defendant FLANAGAN from disclosing or trading on the basis of inside information.

d.    Deloitte had written policies and procedures requiring its employees to report any securities trades and to maintain the confidentiality of information about Deloitte clients obtained during the course of their work.    These procedures expressly prohibited the misuse and misappropriation of information relating to Deloitte clients obtained during the course of their employment, including trading on the basis of that information or tipping that information to others who may use it to trade.  Defendant THOMAS P. FLANAGAN was aware of these policies and procedures and agreed to abide by them.    Defendant FLANAGAN was also aware that a violation of his fiduciary duty of confidentiality constituted a criminal offense.  Deloitte's policies and procedures specifically noted that an individual found to have engaged in insider trading or tipping was subject to a wide range of penalties, including criminal penalties with fines and imprisonment.

e.    Defendant THOMAS P. FLANAGAN owned or controlled trading

accounts in his name and jointly with his wife, in the name of two of his sons, and in the name of a trust for which defendant FLANAGAN served as the trustee (the "Trust").

       f.     A put option contract gave its owner the right to sell a specified amount of stock within a certain time period at a specific price known as the strike price. A put option buyer typically hoped that the stock price would drop. Put options were referred to as "out-of-the-money" when the strike price was lower than the current market price of the underlying stock at the time of the sale. Put options were referred to as "in-the-money" when the strike price was higher than the current market price of the underlying stock at the time of the sale.

2.     Beginning no later than December 2006, and continuing through and including May 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

THOMAS P. FLANAGAN,

defendant herein, directly and indirectly, by the use of means and instrumentalities of interstate commerce and of the facilities of a national securities exchange, willfully used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; and (b) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, which scheme to defraud is further described below.

3.     It was part of the scheme that defendant THOMAS P. FLANAGAN

3

misappropriated material, nonpublic information he obtained during the course of his employment at Deloitte in violation of: (a) the fiduciary and other duties of trust and confidence he owed to Deloitte and to its clients; and (b) Deloitte's express policies regarding the use and safekeeping of confidential information and insider trading. Defendant FLANAGAN used this misappropriated material, nonpublic information to purchase and sell securities to the financial detriment of those on the other side of the transactions, and thereby received substantial illegal profits. Defendant FLANAGAN also tipped Individual A, a relative, while in possession of the material, nonpublic information so that Individual A could benefit from trading on the material, nonpublic information that defendant obtained.

### Walgreens Transactions

4.      It was further part of the scheme that defendant THOMAS P. FLANAGAN did the following:

a.      On or about October 1, 2007, before the stock market opened, Walgreens publicly announced that it earned $.40 per share for the fourth quarter 2007, ending on August 31, 2007. This was 14.8% less than the $.47 earnings per share that stock market analysts had predicted for the fourth quarter 2007, and was Walgreens' first earnings decrease in nearly a decade. Walgreens' stock price closed at $40.16 on October 1, 2007, a 15% decline from the $47.24 closing price on the previous trading day.

b.      Prior to this public announcement of Walgreen's earnings results and during the course of his employment as Deloitte's Advisory Partner on the Walgreens

4

engagement, defendant THOMAS P. FLANAGAN received material, nonpublic information concerning Walgreens' earnings results, including, among other things, draft copies of Walgreens' earnings press releases and financial statements showing that Walgreens earned $.40 per share for the fourth quarter 2007, representing a 3.8% decline from the same quarter of the prior year. Specifically, on the morning of September 25, 2007, defendant received an email from a coworker on Deloitte's Walgreens engagement containing a draft copy of Walgreens' income statement for the fourth quarter of 2007 and fiscal year 2007. This income statement showed that Walgreens had earned $.40 per share for the fourth quarter of 2007. Later in the evening on September 25, 2007, defendant received a draft earnings release from a Deloitte coworker showing that Walgreens had earned $.40 per share for the fourth quarter of 2007, which represented a 3.8% decline from the same quarter of the prior year.

      c.    On or about September 28, 2007, while in possession of the material, nonpublic information about Walgreens' earnings results, defendant THOMAS P. FLANAGAN purchased in the Trust account 350 in-the-money Walgreens October put option contracts with a strike price of $47½ for $1.079 per contract, at a time Walgreens' stock was trading at approximately $47.24 per share. The Trust paid $39,148 for these contracts. Between October 1, 2007, and October 5, 2007, following the public announcement of Walgreens' earnings results, defendant sold all of the Trust's put option contracts for anywhere between $7.10 and $8.00 per contract, generating an illegal profit of

approximately $217,329.

        d.     In addition, beginning on or about September 25, 2007, while in possession of the material, nonpublic information about Walgreens' earnings results, defendant THOMAS P. FLANAGAN tipped Individual A that Individual A should purchase Walgreens put option contracts. On or about September 26, 2007, Individual A purchased 100 out-of-the-money Walgreens October put option contracts with a strike price of $45 for $.35 per contract, at a time when Walgreens' stock was trading at approximately $47.71 per share. Individual A paid $3,585 for these contracts. In addition, on or about September 28, 2007, Individual A purchased 35 in-the-money Walgreens October put option contracts with a strike price of $47½ for $1.10 per contract, at a time when Walgreens' stock was trading at approximately $47.24 per share. Individual A paid $3,886 for these contracts. On or about October 1, 2007, following the public announcement of Walgreens' earnings results, Individual A sold his put option contracts for anywhere between $3.60 per contract and $7.00 per contract, generating an illegal profit of approximately $50,778.

## Motorola Transactions

5.     It was further part of the scheme that defendant THOMAS P. FLANAGAN did the following:

        a.     On or about January 23, 2008, before the stock market opened, Motorola announced in an earnings release that sales of mobile devices had declined 38% during the fourth quarter 2007 compared to the fourth quarter 2006. Motorola also announced in the

earnings release that it was "aggressively rationalizing the company's cost structure." Motorola's stock price closed at $10.01 on January 23, 2008, an 18.75% decline from the $12.32 closing price on the previous trading day.

b.      Prior to this public announcement of Motorola's earnings results and during the course of his employment as a partner on Deloitte's non-audit consulting engagement with Motorola, defendant THOMAS P. FLANAGAN learned of material, nonpublic information concerning Motorola's earnings results, including, among other things, information that Motorola's earnings results were going to be significantly worse than previously thought and that Motorola was planning cost cutting measures. Specifically, on January 3, 2008, a Deloitte partner on the consulting engagement team for Motorola sent an email to defendant and to other members of Deloitte's Motorola engagement team. The email contained an Associated Press article from that day concerning a report that Motorola's handset sales had "missed the Christmas window." The partner wrote in the subject line of the email: "Motorola Inc. Shares Decline –At our mtg. yersterday (sic) [the CEO] said [Mobile Device] performance 'will be significantly worse than anybody imagined' and a huge across the board cost cutting is in the works."

c.      Beginning on or about January 14, 2008, while in possession of the material, nonpublic information about Motorola's earnings results and cost cutting measures, defendant THOMAS P. FLANAGAN purchased in his own account 585 out-of-the-money Motorola February put option contracts with a strike price of $13 for $.17 per contract, at a

time when Motorola's stock was trading at approximately $14.61 per share. On January 23, 2008, shortly after Motorola issued its press release, defendant FLANAGAN sold all 585 put option contracts, generating an illegal profit of approximately $137,474.

## Option Care Transactions

6.      It was further part of the scheme that defendant THOMAS P. FLANAGAN did the following:

a.      On or about July 2, 2007, Walgreens publicly announced that it reached an agreement to acquire Option Care, Inc. ("Option Care") for $19.50 per share. That day, Option Care's stock price closed at $19.24 per share, up 25% from the $15.40 closing price on the previous trading day.

b.      Prior to this public announcement and during the course of his employment as Deloitte's Advisory Partner on the Walgreens engagement, defendant THOMAS P. FLANAGAN learned of material, nonpublic information concerning Walgreens' agreement to acquire Option Care. Specifically, on or about June 18, 2007, defendant participated in a conference call with members of Deloitte's Walgreens engagement team. During the conference call, Deloitte team members informed defendant that Walgreens' acquisition of Option Care was imminent and that the engagement team was monitoring it. The engagement team also explained and discussed Option Care's business lines with defendant.

c.      Beginning on or about June 19, 2007, while in possession of the

material, nonpublic information about Walgreens' agreement to purchase Option Care, defendant THOMAS P. FLANAGAN purchased a total of 2,350 shares of Option Care common stock in two of his sons' accounts for $15.48 per share. Defendant FLANAGAN paid a total of $36,790 for these shares. On the next day, June 20, 2007, defendant FLANAGAN purchased: (i) in his own account, 1,900 shares of Option Care common stock for $15.54 per share; and (ii) in the Trust account, 1,900 shares of Option Care common stock for $15.58 per share. Defendant FLANAGAN and the Trust paid a total of $59,727 for these shares. On or about July 10, 2007, following the public announcement of Walgreens' agreement to purchase Option Care, defendant FLANAGAN sold all the Option Care shares he purchased in his own account, in his sons' accounts, and in the Trust account, for between $19.32 and $19.33 per share. Defendant FLANAGAN's trades generated an illegal profit of approximately $21,233.

      d.     In addition, beginning on or about June 18, 2007, while in possession of the material, nonpublic information about Walgreens' agreement to purchase Option Care, defendant THOMAS P. FLANAGAN tipped Individual A that Individual A should purchase Option Care common stock. On or about June 21, 2007, Individual A purchased 1,200 shares of Option Care common stock for $15.40 per share. Individual A paid $18,494 for these shares. Following the public announcement of Walgreens' agreement to purchase Option Care, Individual A sold 800 Option Care shares for $19.32 per share on July 10, 2007, and another 200 shares on July 24, 2007, for $19.39 per share. On or about September 12, 2007,

Individual A received a cash settlement for the remaining 200 shares as part of Walgreens' tender offer of $19.50 per share. In total, Individual A's trades in Option Care generated an illegal profit of $4,714.

### Sears Transactions

7. It was further part of the scheme that defendant THOMAS P. FLANAGAN did the following:

    a. On or about May 29, 2008, before the stock market opened, Sears publicly announced an earnings loss of $.43 per share for the first quarter. Stock market analysts had previously estimated that Sears would report a first quarter profit of $.21 per share. Sears' stock price closed at $86.14 per share on May 29, 2008, a 3.6% decline from the $89.36 closing price on the previous trading day.

    b. Prior to Sears' public announcement of its earnings results and during the course of his employment as Deloitte's Advisory Partner on the Sears engagement, defendant THOMAS P. FLANAGAN received material, nonpublic information concerning Sears' earnings results, including, among other things, draft copies of Sears' earnings release and financial statements showing Sears' earnings results and its $.43 per share earnings loss. Specifically, defendant learned of Sears' quarterly earnings results for the first quarter on or about May 16, 2008, when the lead engagement partner on Deloitte's Sears engagement team sent defendant an email containing the first draft of Sears' earnings release for the first quarter, which showed the $.43 per share earnings loss.

c.     Beginning on or about May 19, 2008, while in possession of the material, nonpublic information about Sears' earnings results, defendant THOMAS P. FLANAGAN purchased in the Trust account 85 out-of-the-money Sears June put option contracts with a strike price of $90, at a time when Sears' stock was trading at approximately $94.51 per share. The Trust paid $31,020 for these contracts. On or about May 30, 2008, following the public announcement of Sears' earnings results, defendant FLANAGAN sold all of the put option contracts for $7 each, generating an illegal profit of approximately $27,946.

d.     In addition, beginning on or about May 17, 2008, while in possession of the material nonpublic information, defendant tipped Individual A that Individual A should purchase Sears puts option contracts. On or about May 28, 2008, Individual A purchased 40 out-of-the-money Sears June put option contracts with a strike price of $85, at a time when Sears' stock was trading at approximately $94.91 per share. Individual A paid $13,639 for these contracts. From between May 29, 2008 and June 6, 2008, following the public announcement of Sears' earnings results, Individual A sold his put option contracts, generating an illegal profit of $1,204.

**Best Buy Transactions**

8.     It was further part of the scheme that defendant THOMAS P. FLANAGAN did the following:

**Best Buy's Third Quarter 2007 Earnings Press Release**

a.     On or about December 12, 2006, before the stock market opened, Best Buy publicly announced that it earned $.31 per share for the third quarter 2007, ending on November 25, 2006. This was 11.4% less than the $.35 earnings per share that stock market analysts had forecasted. Best Buy's stock price closed at $51.30 on December 12, 2006, a 4.9% decline from the $53.92 closing price on the previous trading day.

b.     Prior to Best Buy's public announcement of its earnings results and during the course of his employment as Deloitte's Advisory Partner on the Best Buy engagement, defendant THOMAS P. FLANAGAN received material, nonpublic information concerning Best Buy's earnings results, including, among other things, draft copies of nonpublic financial documents showing Best Buy's quarterly earnings results. Specifically, defendant learned of Best Buy's earnings results before that information was made public through a December 8, 2006, email he received from the assistant to Best Buy's Vice President of Finance, Planning, and Reporting Management. The email, which was sent in advance of Best Buy's Audit Committee's pre-earnings release conference call scheduled for December 11, 2006, contained as an attachment drafts of Best Buy's Third Quarter Performance Summary, Consolidated Statement of Earnings, and Consolidated Condensed Balance Sheets. These documents contained information showing that Best Buy's quarterly earnings results were $.31 per share and that analysts had forecasted $.35 per share.

c.     Beginning on or about December 11, 2006, while in possession of the

material, nonpublic information about Best Buy's earnings results, defendant THOMAS P. FLANAGAN purchased in the Trust account 40 in-the-money Best Buy December put option contracts with a strike price of $55, at a time Best Buy's stock was trading at approximately $53.92 per share. The Trust paid $2.38-$2.40 per contract, for a total of $9,871. On or about December 12, 2006, following Best Buy's public announcement of its earnings results, defendant FLANAGAN sold all of the Trust's put option contracts for $4.01 per contract, generating an illegal profit of approximately $5,836.

d.     In addition, beginning on or about December 9, 2006, defendant THOMAS P. FLANAGAN tipped Individual A that Individual A should purchase Best Buy put option contracts. On or about December 11, 2006, Individual A purchased 35 out-of-the-money Best Buy December put option contracts with a strike price of $52.50 for $1.25 per contract, and an additional 15 in-the-money put option contracts with a strike price of $55 for $2.50 per contract, at a time when Best Buy's stock was trading at approximately $53.92 per share. Individual A paid a total of $8,182 for these contracts. On or about December 12, 2006, following Best Buy's public announcement of its earnings results, Individual A sold all of his put option contracts, generating an illegal profit of approximately $2,270.

### Best Buy's First Quarter 2008 Earnings Release

e.     On or about June 19, 2007, before the stock market opened, Best Buy publicly announced that it earned $.39 per share for the first quarter of 2008, ending on June 2, 2007. This represented an 18% decline from the prior year's first quarter earnings per

share and was 22% lower than stock market analysts' estimate of $.50 per share. Best Buy's stock price closed at $45.18 per share on June 19, 2007, a 5.9% decline from the $48.01 closing price on the previous trading day.

f.  Prior to Best Buy's public announcement of its earnings results and during the course of his employment as Deloitte's Advisory Partner on the Best Buy engagement, defendant THOMAS P. FLANAGAN received material, nonpublic information concerning Best Buy's earnings results, including, among other things, draft copies of nonpublic financial documents showing Best Buy's quarterly earnings results. Specifically, defendant learned of Best Buy's earnings results before that information became public when he received an email on June 15, 2007, from the assistant to Best Buy's Vice President of Finance, Planning and Reporting Management. The email, which was sent in advance of Best Buy's pre-earnings release conference call scheduled for June 18, 2007, contained as an attachment drafts of Best Buy's First Quarter Performance Summary, Consolidated Statement of Earnings, and Consolidated Condensed Balance Sheets. These documents contained information showing that Best Buy's earnings results were $.31 per share and that analysts had forecasted earnings results of $.35 per share.

g.  Beginning on or about June 18, 2007, while in possession of the material, nonpublic information about Best Buy's earnings results, defendant THOMAS P. FLANAGAN purchased in his own account 210 out-of-the-money Best Buy August put option contracts with a strike price of $45 for $.95 per contract, at a time when Best Buy's

14

stock was trading at approximately $48.01 per share. Defendant FLANAGAN also purchased 315 of the same Best Buy put option contracts in the Trust account. Defendant FLANAGAN paid a total of $51,479 for these contracts. Between June 19, 2007, and June 20, 2007, following Best Buy's public announcement of its earnings results, defendant FLANAGAN sold all of the put option contracts purchased in the Trust account for anywhere from $1.15 to $1.35 per contract, generating an illegal profit of approximately $7,567. On June 20, 2007, defendant FLANAGAN also sold the 210 put option contracts he purchased in his own account for $1.35 per contract, generating an illegal profit of approximately $7,025.

### Best Buy's Press Release on February 15, 2008

h.      On or about February 15, 2008, before the stock market opened, Best Buy issued a press release announcing: (i) a reduction to its fiscal year 2008 earnings forecast from a previous range of $3.10 to $3.20 per share to a range of $3.05 to $3.10 per share; (ii) weaker-than-expected revenue growth from January sales in several major categories; (iii) a lowering of its anticipated annual stores sales gains from approximately 4% to a range of 2.5% to 3%; and (iv) that fourth quarter revenue would fall short of its internal targets. Best Buy's stock price closed at $44.62 on February 15, 2008, a 2.5% decline from the $45.77 closing price on the previous trading day.

i.      Prior to Best Buy's public announcement of its earnings results and during the course of his employment as Deloitte's Advisory Partner on the Best Buy

engagement, defendant THOMAS P. FLANAGAN received material, nonpublic information concerning Best Buy's financial results, including, but not limited to, a draft of the press release showing Best Buy's weaker-than-expected revenue growth from January sales, lower anticipated annual stores sales gains, and fourth quarter revenue shortfall. Specifically, defendant learned of the information contained in Best Buy's press release before that information became public when he received a February 12, 2008, email from Deloitte's lead engagement partner for Best Buy. The email attached a draft of Best Buy's February 15, 2008, press release and included the same information regarding Best Buy's weaker-than-expected revenue growth from January sales, lower anticipated annual store sales gains, and predicted fourth quarter revenue shortfall.

j. Beginning on or about February 13, 2008, while in possession of the material, nonpublic information from Best Buy's draft press release, defendant THOMAS P. FLANAGAN purchased in the Trust account 100 out-of-the-money Best Buy March put option contracts with a strike price of $45 for $1.95 per contract, at a time when Best Buy's stock was trading at approximately $46.58 per share. He also purchased 50 of the same Best Buy put option contracts in his own account. Defendant FLANAGAN and the Trust paid a total of $28,840 for these contracts. On March 5, 2008, following public issuance of Best Buy's press release, defendant FLANAGAN sold the put option contracts for between $2.30 and $2.72 per contract, generating an illegal profit of approximately $5,834.

## **Efforts to Conceal The Scheme**

9.      It was further part of the scheme that, in an effort to hide his trading in restricted Deloitte clients such as Walgreens, Best Buy, and Sears, defendant THOMAS P. FLANAGAN knowingly submitted to Deloitte personnel who prepared his personal federal and state income taxes false information regarding his trading activities.  While defendant accurately reported the gains on all transactions, he knowingly listed trades in other companies in place of Walgreens, Best Buy and Sears, so that defendant FLANAGAN could hide that he had interests in, and was trading based on inside information of, restricted Deloitte clients.

10.     It was further part of the scheme that defendant THOMAS P. FLANAGAN did misrepresent, conceal, and hide, and caused to be misrepresented, concealed, and hidden, the true purpose of the acts done in furtherance of the scheme.

11.     It was further part of the scheme that, as a result of the trades based on material, nonpublic information listed above, defendant THOMAS P. FLANAGAN received illegal profits of at least approximately $420,000, and Individual A received illegal profits of at least approximately $58,000, all to the financial detriment of those persons or entities on the other side of the transactions.

12.     On or about October 5, 2007, in Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

THOMAS P. FLANAGAN

defendant herein, for the purpose of executing the above-described scheme to defraud, in connection with the purchase and sale of securities, specifically option contracts, knowingly and willfully used and caused the use of the facilities of a national securities exchange, namely the Chicago Board of Options Exchange, in order to sell in the Trust account ninety put option contracts with a strike price $47½ at a price of $8 per contract;

In violation of Title 15, United States Code, Sections 78j(b) and 78ff(a) and Title 17, Code of Federal Regulations, Section 240.10b-5.

ACTING UNITED STATES ATTORNEY